315 P.2d 653

**FARMERS and MERCHANTS BANK, a corporation, Plaintiff, Respondent and Cross-Appellant,**

v.

**UNIVERSAL C.I.T. CREDIT CORPORA-TION, Defendant, Appellant and Cross-Respondent.**

**No. 8635.**

Supreme Court of Utah.

Sept. 17, 1957.

414

George E. Bridwell, Salt Lake City, for appellant.

Elias L. Hansen, Salt Lake City, J. Rulon Morgan, Provo, for respondent.

COWLEY, District Judge.

This is the second appeal in this case. The facts are set forth in detail in the first decision, Farmers and Merchants Bank v. Universal C. I. T. Credit Corporation, 4 Utah 2d 155, 289 P.2d 1045. Some of the facts will be repeated here and such other facts as are deemed necessary to this decision. In October, 1952, defendant corporation undertook to finance the operation of Harry Parsley, Inc., a Lincoln-Mercury dealer in Provo, Utah. It was orally agreed among the dealer, the plaintiff bank and the defendant finance company that Parsley would be permitted to deposit sight drafts with plaintiff bank, drawn on defendant finance company, and get immediate cash credit in its bank account on the strength of the deposited drafts, and defendant would honor and pay such sight drafts. Both retail and wholesale financing was provided for in the agreement.

As pointed out in the former decision, this financing continued unquestioned until December 24, 1952, when the bank was instructed by an officer of the C. I. T. not to treat sight drafts for wholesale financing as cash from that date forward. The evidence was in conflict as to the agreed means of distinguishing between a wholesale and retail draft, but, at any rate plaintiff bank continued giving immediate credit to the Parsley account upon receipt of drafts and allowing checks to be drawn against the credit. On January 6, 1953, an officer of C. I. T. instructed the bank that no more drafts drawn by Parsley would be accepted by the corporation. On the same day the plaintiff bank credited 13 drafts to the account of Parsley, totaling $29,223.65, claiming that the C. I. T. officer orally promised that all drafts in process up to the close of business January 6, 1953, would be honored and further contending that no mention was made in the oral promise as between wholesale and retail drafts.

Likewise on January 6, 1953, the C. I. T. presented and received payment for 10 checks drawn in favor of the corporation on the Parsley account in the amount of $24,668.03, which are the subject of this second appeal. On January 7, 1953, the bank contends that further representations were made by agents of the defendant corporation that the drafts would be paid, and on January 8, 1953, when the C. I. T. presented additional checks to the bank for cashing in excess of $20,000 and were refused because of insufficient funds in the Parsley account to pay this additional amount, and further because Parsley had issued directions to the bank not to pay any checks in excess of $300, the C. I. T. refused to honor the 13 drafts above mentioned.

The plaintiff bank later surrendered to Harry Parsley, Inc., four of the 13 dishonored drafts in exchange for a promissory note for $21,000, secured by a chattel mortgage and an assignment of accounts receivable.

The first trial was based on the drafts presented to the bank by Parsley as drawer on January 6, 1953, for which the bank gave immediate cash credit to the Parsley account and were dishonored by the C. I. T. Corporation as drawee on January 8, 1953. The trial court rendered judgment to the plaintiff in the first action based upon the outstanding drafts in the sum of $29,223.65, less the sum of $7,792.57, which represented the balance in the Parsley account when it was closed out on January 10, 1953, and charged back to the account by the bank, and the court subtracted the four drafts above mentioned, awarding a net judgment to the plaintiff in the sum of $17,876.81 against the defendant, together with interest and costs.

This court did not allow a recovery on the basis of the outstanding drafts on the first appeal because of the bank's dereliction of duty in continuing the practice of granting immediate credit on the drafts presented to the bank after December 24, 1952, when it was put on notice that Parsley's Inc., was in financial difficulty, particularly as to wholesale financing. See Farmer's and Merchant's Bank v. Universal C. I. T. Credit Corporation, above.

In reversing the trial court we remanded the case for further proceedings based upon the ten checks presented by the C. I. T. and paid by the bank the same day as the outstanding drafts were received by the bank from Parsley, in the following language:

"However, one of the allegations of the complaint in this action stated that at the time checks were presented to the bank for payment to C. I. T., that corporation knew or should have known that the only source from which said checks could be paid was the credits given to Parsley for the drafts which the corporation later refused to honor. No specific finding was made by the trial court on this matter; although the court did make the finding that the checks were paid in reliance on the assurances of C. I. T. personnel that the drafts would be paid and a general finding of issues not specifically mentioned in plaintiff's favor. * * * Since the judgment was rendered on the basis of outstanding drafts, rather than the checks whose payment was wrongfully induced by appellants, this case must be reversed and remanded for further proceedings." Farmer's and Merchant's Bank v. Universal C. I. T. Credit Corporation [4 Utah 2d 155, 289 P.2d 1049] above.

We further said in the previous appeal, "If the payee of a check has knowledge that there are no funds on deposit to meet it, and the bank pays the check in ignorance of that fact, there may be a recovery of the payment. Peterson v. Union National Bank, 52 Pa. 206, 91 Am.Dec. 146."

The only issue at the second trial and on this appeal is plaintiff's contended right to recover on the ten checks in question totalling $24,668.03, which the bank paid to C. I. T. on January 6, 1953. The specific questions to be determined by the mandate of the Supreme Court in the former decision are (1) whether the payee of said checks, C. I. T., had knowledge that there were no funds on deposit in the Parsley account to meet the said checks; and (2) whether the plaintiff bank paid the checks in ignorance of the fact that there were no funds to pay them. The answer to these questions depends upon the alleged promises made by the officers and agents of the C. I. T. to the bank on January 6 and 7, 1953, that the 13 drafts would be honored and paid which Parsley presented to the bank on January 6, the same day the checks were presented by C. I. T. for payment, and the bank's reliance on the promises in granting immediate credit on the drafts, which were later dishonored.

At the conclusion of the second trial the court made findings favorable to the plaintiff on the above questions and granted judgment to the plaintiff on the 10 checks in the sum of $24,668.03, less certain set-offs which constitute plaintiff's cross-appeal and will be discussed later.

█ If the findings and judgment of the trial court are substantially supported by evidence the Supreme Court may not disturb them, since this is a case at law. Sine

v. Salt Lake Transportation Co., 106 Utah 289, 147 P.2d 875.

█ At the outset it must be kept in mind that the uncontroverted evidence reveals that the bank had control of the checks in question through the day of January 7, 1953, and until nearly 8 p. m. of said day, and could have protected itself until said time by dishonoring the checks, had the alleged promises to honor the drafts not been made, if in fact said promises were made.

The testimony is in conflict as to the alleged promises to honor the drafts. The Vice-President and Cashier of the bank testified in substance that on January 6, the Salt Lake City Branch Manager of C. I. T. told him by long distance telephone from Salt Lake City that all sight drafts would be honored that were in process up to and including the 6th, but none thereafter unless specially authorized. On the morning of the 7th, the branch manager and one other agent made a trip to Provo and again said the drafts would be honored, and again at 4:30 p. m. on the 7th, after banking hours, an agent of C. I. T. from Seattle visited the bank and told another Vice-President of the bank that the drafts would be paid. The Salt Lake City Branch Manager was not a witness and his testimony stands uncontradicted as to the telephone conversation on the 6th, and the other two agents of C. I. T., while admitting their visits to the bank and other parts of their

respective conversations in the forenoon and afternoon of the 7th, deny that anything was said about the drafts or the honoring of them.

At the close of business on January 5, the Parsley bank account had a balance of $14.-04 which was known to the bank, and since it was also known to the bank that the only source of credit from which the 10 checks, totalling a large amount, could be paid was the drafts, it is incredible to believe that the bank would have honored the checks on January 6, or at least to have protected itself and dishonored the checks on January 7, if the promises to honor the drafts had not been made. In any event, we must hold that the findings as to the promises made and the reliance upon them are supported by substantial evidence, and therefore the bank did not know that there were no funds available to meet the checks until the drafts were dishonored on January 8, 1953, contrary to the promises.

■ Defendant corporation's contention that the bank did know that the Parsley account was without funds to pay the checks is without merit in view of the promises made as discussed above. *Except for the promises,* defendant's contention and this court's decision in the first appeal would have eliminated the bank's right to expect the 13 drafts of January 6 to be honored and constitute a source of credit to pay the ten checks.

The other contention that the C. I. T. Credit Corporation did not know that Parsley, Inc., did not have enough funds on deposit in plaintiff bank to pay it $24,668.03, the sum of the 10 checks, is also without merit. On January 6 the C. I. T. had notice that a check in the sum of $2,495 was being returned unpaid. It would appear that because of this fact the daily conversations, by telephone and trips to Provo, were commenced and probably to assure the bank that the drafts would be paid. The finance company also noticed on January 7 that three other checks totalling $10,406.55 had been turned down because of insufficient funds to pay the same. Meanwhile defendant corporation had accumulated several thousand dollars worth of uncollected Parsley checks which it was concerned about collecting and two trips to Provo, one at 4:30 p. m. on January 7, and again on the morning of January 8, were primarily for the purpose of getting the bank to honor these latter checks. It was because of the bank's refusal on the morning of January 8 to honor and pay this group of checks that the C. I. T. dishonored the drafts upon the order of a Vice-President of C. I. T., who had come from Seattle to Provo and had attempted to get the bank to honor the additional uncollected checks which totalled more than $20,000. All the drafts presented to the bank on January 6, 1953, 13 in number, were dishonored without regard as to whether they were wholesale or retail.

The activities that went on between the officers and agents of C. I. T. with the officers of the bank is sufficient evidence to support the findings of the trial court that C. I. T. had knowledge that the Parsley bank account was insufficient to meet the ten checks in question, unless the drafts were honored.

From the judgment granted to the plaintiff on the 10 checks in question in the total sum of $24,668.03, the court deducted the sum of $3,554.27 which represented the four dishonored sight drafts of the 13 which the bank returned to Parsley as part consideration for the $21,000 note secured by the chattel mortgage and accounts receivable, and later by amendment under Rule 60 (a) and (b) (1) the trial court further deducted the sum of $7,792.57 it impounded from the Parsley bank account. The plaintiff cross-appeals from these two offsets.

First as to the four drafts the trial court deducted from the judgment. Parsley requested the bank to return these four dishonored drafts because they were retail and probably could be sold elsewhere. This the bank did as part consideration for the $21,-000 note, chattel mortgage and accounts receivable referred to above.

This court held in the former decision that the $21,000 note and mortgage did not constitute payment of the debt which Parsley, Inc., owed to the bank, thus the C. I. T. was not discharged from the obligation,

289 P.2d 1049. This being so the sum of the four drafts cannot be subtracted from the judgment; although C. I. T. is entitled to credit against the plaintiff bank for any amounts actually realized by the bank on the $21,000 note from Parsley.

At the close of business on January 10, 1953, there was a credit in the bank account of Parsley, Inc., in the sum of $7,-792.57, the same being the amount that the trial court held was impounded and the additional amount the trial court deducted from the judgment. Of the above amount $4,555.62 constituted the balance of the total credit the bank wrongfully gave Parsley on the 13 dishonored drafts. The $4,-555.62 is arrived at by subtracting the bank's total loss in honoring the 10 checks in question, $24,668.03, from the total credit the bank gave the Parsley account on the 13 dishonored drafts, which was $29,223.65. The bank was entitled to be reimbursed by Parsley, Inc., for the credit given for the dishonored drafts, and had a right to offset the amount from the balance of said wrongful credit remaining in the Parsley account on January 10. "It may be stated as a general rule that when a depositor is indebted to a bank and the debts are mutual—that is, between the same parties and in the same right—the bank may apply the deposit, to the payment of the debt due it by the depositor, provided there is no express agreement to the contrary and the deposit is not specifically applicable to some other

particular purpose. 7 Am.Jur., Sec. 629, p. 455."

However, since the Parsley account was somewhat active from January 6 to 10, both days inclusive, the account had a balance of good credit received from other sources in the sum of $3,236.95, so when at the close of business on January 10 the bank charged back the entire amount of $7,792.57, *it did in fact reduce its total loss on the 10 checks in question* by the sum of $3,236.95, therefore C. I. T. is entitled to an offset in this latter amount and the bank is entitled to a net judgment in the sum of $21,431.08, together with interest at 6% from January 7, 1953, and costs.

■ Some money was received by the bank and credited to Parsley after the account was closed on January 10, 1953, but, as pointed out by the brief of respondent and cross-appellant, this money was collected after Parsley, Inc. was thrown into bankruptcy, and, therefore, the bank must account to the Bankruptcy Court for this money.

The judgment of the trial court is modified. Costs to respondent and cross-appellant.

McDONOUGH, C. J., and WADE, J., concur.

CROCKETT, Justice (concurring specially).

I concur, adding this comment: The evidence supports the finding of the trial court that the 10 checks totaling $24,668.03 were presented for payment by C. I. T. when it knew that there were neither funds nor credit in the account of the maker (Parsley) *to pay them, which fact was not known to* the plaintiff bank. This is so because the bank relied on the promised acceptance by C. I. T. of the 13 drafts it had reecived the same day totaling $29,223.65.

The item of $3,554.27 which was allowed as an offset against the $24,668.03 which the bank lost by mistakenly paying the 10 checks, has no relationship to that figure whatsoever. It represents the total of four of the dishonored sight drafts (which are assumed to be retail transactions) and which the bank returned to Parsley in connection with its receipt of the $21,000 note and chattel mortgage. The further fact with respect to these particular four transactions is that after they were returned to Parsley, he turned them over directly to C. I. T. who accepted them and will realize the proceeds on those contracts from the purchasers of the cars named therein. It thus seems clear that C. I. T. is not entitled *to any offset of the $3,554.27 against the loss* the bank suffered in cashing the checks.

I also agree that the $7,792.57 (the figure on the books of the bank showing Parsley's account on January 10) was improperly allowed as an offset against the judgment. This is so because it bears no relationship

to the actual loss of the plaintiff bank and is merely a fictitious figure representing the amount that would have been in the Parsley account had the $29,223.65 in drafts been honored by defendant C. I. T. However, it does not necessarily follow that no deduction at all should be allowed. Between January 6 and January 10, 1953, the 10 checks upon which the bank seeks recovery were paid. It was also within this period of time that the drafts were dishonored by the defendant. It appears from the record that during this time Parsley made deposits into his account other than the drafts which were subsequently dishonored. Thus the bank balance of $7,792.57 is made up partly of the false credit of the dishonored drafts and partly of bona fide credits deposited by Parsley.

The record and documentary evidence before us indicates that Parsley's bank balance on January 6, plus his bona fide credits, less certain checks drawn on the account (other than those to C. I. T.) equals $3,236.95. This is the figure which should properly be deducted from the $24,668.03, leaving a net judgment of $21,431.08 plus interest and costs.

WORTHEN, J., having disqualified himself, does not participate.

HENRIOD, J., does not participate.